ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL X

| BIO-MEDICAL APPLICATIONS OF PUERTO RICO, INC.; BIO-MEDICAL APPLICATIONS OF BAYAMÓN, INC., Recurrente, v. DEPARTAMENTO DE SALUD, SECRETARÍA AUXILIAR PARA LA REGLAMENTACIÓN Y ACREDITACIÓN DE FACILIDADES DE SALUD (SARAFS), Recurrida, v. PURE LIFE RENAL OF BAYAMÓN, LLC., Parte Indispensable. | KLRA202500013 | REVISIÓN procedente del Departamento de Salud. Querella núm.: Q-22-09-021. Sobre: violación a la *Ley de Certificados de Necesidad y Conveniencia*, Ley Núm. 2 de 7 de noviembre de 1975, según enmendada; y al *Reglamento del secretario de Salud para regir el otorgamiento de certificados de necesidad y conveniencia*, Reglamento Núm. 9084. |

Panel integrado por su presidenta, la juez Lebrón Nieves, la jueza Romero García y el juez Rivera Torres.

Romero García, jueza ponente.

SENTENCIA

En San Juan, Puerto Rico, a 24 de febrero de 2025.

La parte recurrente, compuesta por Bio-Medical Applications of Puerto Rico, Inc., y Bio-Medical Applications of Bayamón, Inc. (BMA), comparece y nos solicita que revoquemos la *Resolución* emitida por el Secretario de Salud de Puerto Rico, Dr. Carlos R. Mellado López, el 28 de octubre de 2024. Mediante el referido dictamen, el Secretario de Salud acogió la recomendación de la Oficial Examinadora y declaró **sin lugar** la querella presentada por BMA contra el Departamento de Salud, mediante la cual BMA había impugnado la *Resolución* Núm. 21-11-042, para establecer un Centro de Diálisis Renal de veintiocho (28) estaciones de hemodiálisis y una (1) estación de diálisis en la subregión de Bayamón.

Por los fundamentos expuestos a continuación, **confirmamos** la resolución recurrida.

I

La controversia ante nos surge luego de que, el 25 de octubre de 2021, Pure Life Renal of Bayamón, LLC (PLR) presentara una solicitud de Certificado de Necesidad y Conveniencia (CNC)[1] ante la Secretaría Auxiliar para la Reglamentación y Acreditación de Facilidades de Salud (SARAFS). A la referida solicitud, adjuntó el estudio pericial rendido por su perito, el señor Antonio J. Fernós Sagebién, intitulado *Estudio de Necesidad y Conveniencia para un Centro de Diálisis Renal en la Subregión de Bayamón* fechado 25 de octubre 2021[2].

Tras los procedimientos de rigor, el 4 de marzo de 2022, la SARAFS celebró la vista pública con el fin de atender la referida solicitud de CNC. Celebrada la vista pública, y luego de evaluar la prueba documental que formaba parte del expediente administrativo, el Oficial Examinador, William Rodríguez Lugo, emitió su Informe[3]. En lo pertinente, el expediente contenía, entre otros, un *Informe de oposición sobre estudio de necesidad y conveniencia* de diciembre de 2021, preparado por Advantage Business Consulting, presentado por BMA el 29 de julio de 2022; la *Actualización a Estudio Pericial de Necesidad y Conveniencia* del perito de PLR, el economista señor Antonio Fernós Sagebién, fechado el 18 de enero de 2022, y las *Contestaciones a oposición*. A base de todo ello, el Oficial Examinador recomendó que se le concediera a PLR la autorización para establecer el centro de diálisis renal[4].

---

[1] El certificado de necesidad y conveniencia es un documento emitido por el Secretario de Salud que autoriza a una persona a llevar a cabo cualquiera de las actividades cubiertas por la *Ley de Certificados de Necesidad y Conveniencia*, 24 LPRA sec. 334, *et seq.*, y certifica que la aludida actividad es necesaria para la población que va a servir, además de que no afectará indebidamente los servicios existentes, contribuyendo así al desarrollo ordenado y adecuado de los servicios de salud en Puerto Rico. 24 LPRA sec. 334.

[2] PLR presentó la solicitud del CNC mediante la propuesta Núm. 21-11-42.

[3] *Véase*, apéndice del recurso, a las págs. 74-100.

[4] *Íd.*, a la pág. 75.

El 5 de agosto de 2022, el Secretario de Salud emitió una *Resolución* en la que acogió el Informe del Oficial Examinador, según este le fuera sometido el 29 de julio 2022, y, en su consecuencia, otorgó el CNC solicitado por PLR para rendir sus servicios como Centro de Diálisis Renal en la Sub-Región de Bayamón[5].

Posteriormente, el 8 de septiembre de 2022, BMA presentó una querella ante la SARAFS e impugnó la *Resolución* emitida por el Secretario de Salud el 5 de agosto de 2022[6]. Entre sus alegaciones, BMA sostuvo que el Secretario había errado al concluir que existía la población, la demanda de servicios de diálisis y la tasa de utilización en la subregión de Bayamón que justificaban la concesión del CNC. En particular, señaló que el Secretario había basado su determinación y tomado en consideración la cantidad de estaciones de diálisis para pacientes que recibían tratamiento en el hogar; ello, en una presunta contravención a la *Ley de Certificados de Necesidad y Conveniencia*, 24 LPRA sec. 334, *et seq*., y al Reglamento Núm. 9084 de 17 de mayo de 2019, conocido como el *Reglamento del Secretario de Salud para regir el otorgamiento de certificados de necesidad y* conveniencia[7] (Reglamento 9048).

Además, BMA sostuvo que la *Resolución* emitida por el Secretario carecía de una determinación sobre la población estimada en la subregión de Bayamón, y tampoco contenía un análisis sobre la demanda de servicios de esa subregión. Además, apuntó que la determinación estuvo basada en información errónea e insuficiente. Lo anterior, a pesar de que dichas omisiones habían sido señaladas en su informe pericial, según preparado por Advantage Business Consulting.

El 29 de septiembre de 2022, PLR presentó su contestación a la querella[8]. En ella, además de negar las alegaciones esenciales, sostuvo

---

[5] *Véase*, apéndice del recurso, a las págs. 70-100. La misma fue notificada el 9 de agosto de 2022

[6] *Íd.,* a las págs. 1-111.

[7] El Reglamento 9084 entró en vigor el 17 de junio de 2019.
[8] *Véase*, apéndice del recurso, a las págs. 114-121.

que la determinación del Secretario de Salud sobre la población y demanda de servicios de diálisis estuvo enmarcada en el ámbito de sus facultades, así como en el análisis de la información presentada, según se relacionaba con cada criterio. Adujo que la demanda y necesidad de los servicios autorizados habían quedado evidenciados durante el proceso administrativo, el cual satisfizo los criterios requeridos por los estatutos aplicables. De otra parte, sostuvo que la metodología propuesta por BMA para calcular la necesidad de estaciones se distanciaba de aquella requerida por el Reglamento 9048.

Por su parte, el 17 de enero de 2023, el Departamento de Salud, a través de la SARAFS, presentó su alegación responsiva a la querella[9]. En esencia, planteó las mismas defensas previamente esbozadas por PLR en cuanto a que el Secretario de Salud había actuado dentro del marco de sus facultades y al amparo de los informes presentados en las vistas públicas relacionadas a la propuesta Núm. 21-11-042. Además, sostuvo que la querella dejaba de exponer hechos que ameritaran la concesión del remedio solicitado.

Tras varias incidencias procesales, el 18 de agosto de 2023, BMA presentó una solicitud de resolución sumaria[10]. Reiteró los argumentos expuestos en su querella y adjuntó los informes periciales que estuvieron ante la consideración de la SARAFS durante el proceso de solicitud del CNC.

En reacción a la solicitud presentada por BMA, el 20 de septiembre de 2023, PLR presentó su oposición a la solicitud de resolución sumaria[11]. Expresó que BMA se limitaba a reiterar argumentos que habían sido discutidos y atendidos durante el procedimiento de la propuesta del CNC Núm. 21-11-042. En atención a lo anterior, resaltó que la controversia planteada estuvo ante la consideración del Oficial Examinador previo a

---

[9] *Íd.,* a las págs. 146-149.

[10] *Íd.*, a las págs. 152-237.

[11] *Íd.*, a las págs. 238-350.

emitir su Informe. Sostuvo que, contrario a lo planteado por BMA, tanto el informe pericial como el resto de la evidencia sometida en el proceso de vistas públicas, contenían todos los elementos requeridos para el cumplimiento con la reglamentación aplicable.

Por su parte, el 28 de febrero de 2024, la SARAFS presentó una moción mediante la cual adoptó por referencia las alegaciones presentadas por PLR en su oposición a la solicitud de resolución sumaria[12].

Sometida la controversia, el 25 de octubre de 2024, la Oficial Examinadora, Verónica Jorge Barranco, presentó el Informe correspondiente a la querella Núm. 22-09-021[13]. El 30 de octubre de 2024, el Secretario notificó a las partes su determinación final. En ella, acogió y adoptó la recomendación de la Oficial Examinadora, por lo que declaró sin lugar la querella presentada por BMA[14].

Inconforme con la determinación del Departamento de Salud, el 20 de noviembre de 2024, BMA presentó una solicitud de reconsideración. El 9 de diciembre de 2024, la misma fue declarada sin lugar[15].

Aún inconforme, el 8 de enero de 2025, BMA instó este recurso y formuló los siguientes señalamientos de error:

> Erró el Secretario al considerar la población flotante para determinar la población total de la Subregión de Bayamón.
>
> Erró el Secretario al conceder el CNC a Pure Life sin un análisis de oferta y demanda, según requerido bajo el Reglamento 9084.
>
> Erró el Secretario al descansar en una metodología y un cálculo de tasa de utilización incorrecto para determinar que existe una tasa que justifique la concesión del CNC solicitado por Pure Life.

(Énfasis omitido).

Conforme les fuese ordenado, el 10 de febrero de 2025, compareció tanto el Departamento de Salud, como PLR, y presentaron sus sendas oposiciones al recurso.

---

[12] *Véase*, apéndice del recurso, a las págs. 431-432.

[13] *Íd.*, a las págs. 439-453.

[14] *Íd.*, a las págs. 437-438.

[15] *Íd.*, a las págs. 467-468.

Examinada la totalidad del expediente, y con el beneficio de la comparecencia de las partes, resolvemos.

II

A

Es norma reiterada que las decisiones de los organismos administrativos merecen la mayor deferencia judicial, pues son estos los que cuentan con el conocimiento experto de los asuntos que les son encomendados. *The Sembler Co. v. Mun. de Carolina*, 185 DPR 800, 821 (2012). Además, al momento de revisar una decisión administrativa, el criterio rector para los tribunales será la razonabilidad de la actuación de la agencia. *González Segarra et al. v. CFSE*, 188 DPR 252, 276 (2013).

Así pues, las determinaciones de hechos de los organismos y agencias "tienen a su favor una presunción de regularidad y corrección que debe ser respetada mientras la parte que las impugne no produzca evidencia suficiente para derrotarlas". *Vélez v. A.R.Pe.*, 167 DPR 684, 693 (2006). Es por ello por lo que la revisión judicial ha de limitarse a determinar si la agencia actuó de manera arbitraria, ilegal, irrazonable, o fuera del marco de los poderes que se le delegaron. *Torres v. Junta Ingenieros*, 161 DPR 696, 708 (2004).

Cónsono con lo anterior, con el propósito de "convencer al tribunal de que la evidencia en la cual se fundamentó la agencia para formular una determinación de hecho no es sustancial, la parte afectada debe demostrar que existe otra prueba en el expediente que reduzca o menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración". *Misión Ind. P.R. v. J.P.*, 146 DPR 64, 131 (1998).

No obstante, las conclusiones de derecho de las agencias administrativas serán revisables en toda su extensión. *Torres Santiago v. Depto. Justicia*, 181 DPR 969, 1003 (2011); *Asoc. Fcias. v. Caribe Specialty et al.* II, 179 DPR 923, 941 (2010*). Sin embargo, esto no significa que los

tribunales podemos descartar libremente las conclusiones e interpretaciones de la agencia. *Otero v. Toyota*, 163 DPR 716, 729 (2005).

En fin, como ha consignado el Tribunal Supremo, la deferencia concedida a las agencias administrativas únicamente cederá cuando: (1) la determinación administrativa no esté basada en evidencia sustancial; (2) el organismo administrativo haya errado en la aplicación o interpretación de las leyes o los reglamentos que se le ha encomendado administrar; (3) cuando el organismo administrativo actúe arbitraria, irrazonable o ilegalmente, al realizar determinaciones carentes de una base racional; o, (4) cuando la actuación administrativa lesione derechos constitucionales fundamentales. *IFCO Recycling v. Aut. Desp. Sólidos*, 184 DPR 712, 744-745 (2012).

B

Ley Núm. 2 de 7 de noviembre de 1975, según enmendada, conocida como la *Ley de Certificados de Necesidad y Conveniencia*, 24 LPRA secs. 334, *et seq.* (Ley 2), fue creada para asegurar la planificación ordenada de las instalaciones y servicios de salud en Puerto Rico. Esta legislación precisa la facultad que posee el Secretario de Salud al momento de otorgar un Certificado de Necesidad y Conveniencia (CNC) para el establecimiento de nuevas instalaciones de salud, cuando ello sea necesario y conveniente para la población que dichas entidades van a servir, siempre que no se afecten indebidamente los servicios existentes. *Lab. Inst. Med. Ava. v. Lab. C. Borinquen*, 149 DPR 121, 127 (1999).

El CNC constituye un mecanismo de planificación, mediante el cual el Secretario formula e implanta, a la vez, la política pública sobre los servicios de salud. Es decir, cuando se otorga o se deniega un CNC se considera el desarrollo de las entidades de salud en las distintas áreas regionales establecidas. *Asoc. Fcias. Com. v. Depto. de Salud*, 156 DPR 105, 127-129 (2002); *Ruíz Hernández v. Mahiques*, 120 DPR 80, 89 (1987).

Así, nuestro ordenamiento jurídico dispone que será necesario poseer un CNC para el establecimiento y operación de una instalación de

salud. A esos efectos, la Ley 2 contiene disposiciones específicas y rigurosas que el Secretario de Salud deberá observar durante las etapas del proceso de evaluación de los certificados solicitados. *Lab. Inst. Med. Ava. v. Lab. C. Borinquen*, 149 DPR, a las págs. 132-133.

El Secretario de Salud es quien establece, mediante reglamento, el procedimiento para el recibo y evaluación de las solicitudes de CNC. Art. 7 de la Ley 2, 24 LPRA sec. 334f-2. El Reglamento Núm. 9084 de 17 de mayo de 2019, aplicable al caso que nos ocupa, rige el proceso de evaluación de las solicitudes para el otorgamiento de un CNC.

Por la naturaleza de la controversia que se nos ha presentado, es preciso recalcar varias definiciones que surgen del aludido Reglamento, entre estas, las siguientes:

> Área de Servicio – Se refiere a determinadas áreas geográficas establecidas en este Reglamento para permitir el desarrollo ordenado de la distribución de facilidades de Salud en Puerto Rico. Toda solicitud identificará y se limitará al Área de Servicio aplicable conforme a las disposiciones de este Reglamento.
>
> Población Flotante – Se refiere a la población que no reside dentro de una delimitación geografía particular y que visita o se traslada a tal delimitación geográfica por motivo de trabajo, estudio, o cualquier otra actividad habitual o recurrente. En relación a una Acción Propuesta en la que el Área de Servicio sea la Milla Radial, se utilizara un estimado de Población Flotante que se pueda obtener de la información pertinente y disponible que provenga del lugar más cercano al Área de Servicio aplicable. La metodología utilizada para calcular la Población Flotante de un Área de Servicio tendrá que excluir a la población Residente correspondiente.
>
> Población Residente – Se refiere a la población que tiene su residencia permanente dentro de una delimitación geográfica partículas determinada y estimada por el Negociado Federal del Censo, la Junta de Planificación de Puerto Rico y/o cualquier otro organismo gubernamental estatal o federal.
>
> En cuanto al proceso mediante el cual se puede solicitar y otorgar

un CNC cuando se trate de un centro de salud nuevo, el Reglamento dispone en su Art. V que toda solicitud de CNC deberá presentarse mediante el formulario o método electrónico provisto por el Departamento de Salud, y será acompañada, en lo pertinente, de los siguientes documentos:

.        .        .        .        .        .        .        .        .        .

Un estudio de viabilidad económica del proyecto, el cual debería incluir un análisis de la viabilidad funcional y operacional de la Acción Propuesta a la luz de las disposiciones de este Reglamento.

El estudio incluirá, además, un análisis financiero, con una descripción de la metodología utilizada, una descripción del Área de Servicio, que incluya la oferta y demanda del área a ser servida y el impacto socioeconómico de la propuesta. Dicho estudio deberá estar acompañado de evidencia de que el Proponente podrá reclutar personal técnico especializado con la capacidad profesional necesaria para operar la Facilidad de Salud propuesta.

.     .     .     .     .     .     .     .     .     .

Surge de ese mismo Art. V que la SARAFS no tiene la facultad de expedir un CNC, cuando la entidad solicitante no cumpla con alguno de los requisitos del Reglamento. Así, ante una solicitud defectuosa, el curso a seguir será concederle un término máximo de 15 días calendario a la parte solicitante para corregir o enmendar su propuesta. De vencer el término concedido sin que medie el cumplimiento, se podrá ordenar el archivo sin perjuicio de la solicitud.

En su Art. VI, el Reglamento 9048 también establece unos criterios generales a considerar al momento de evaluar las solicitudes de CNC. Expresamente dispone que el Secretario de Salud tomará en cuenta los mismos, en la medida en que sean aplicables, y aclara "que en el referido proceso evaluador, el Secretario mantendrá la discreción necesaria para sopesar y examinar dichos criterios, en aquella forma y manera que facilite el poner en vigor las disposiciones de la Ley de CNC y la política pública del Departamento de Salud". También, surge del referido artículo que el Secretario tendrá discreción para atemperar, modificar o paralizar la aprobación de una solicitud de CNC, según sea necesario, para garantizar la salud de la población y el mejor acceso a los servicios de salud.

Examinado el Reglamento 9084, no surge una fórmula exacta mediante la cual una parte solicitante deba presentar la población que recibirá los servicios. Los criterios particulares que debe considerar el Secretario de Salud para el otorgamiento de un permiso para una instalación de salud, en este caso, un centro de diálisis renal, son los

enumerados en el Art. VIII del Reglamento 9048. En lo concerniente, dicho artículo establece en su inciso (v) que:

> **La necesidad existente para un Centro de Diálisis Renal estará basada en la tasa de incidencia y prevalencia de pacientes con enfermedades renales permanentes para el año pertinente y en el área de servicio aplicable.** Esta necesidad deberá poderse validar con el Consejo Renal de Puerto Rico o cualquier otra entidad reconocida que disponga de estadísticas de incidencia de enfermedades renales en Puerto Rico.

(Énfasis nuestro).

De otra parte, no podemos obviar que el Tribunal Supremo de Puerto Rico ha expresado que la decisión de otorgar o denegar un CNC surge de un proceso evaluativo institucional, que culmina con la decisión del Secretario. Es decir, se trata de un proceso que requiere la evaluación de muchas circunstancias y factores complejos, así como la ponderación de varios criterios diversos. *Hosp. San Pablo v. Hosp. Hnos. Meléndez*, 123 DPR 720, 732-733 (1989).

III

La parte recurrente plantea que el Secretario de Salud erró al considerar data imprecisa y al tomar en consideración la población flotante para determinar la población total de la subregión de Bayamón. Arguye que PLR no evidenció la existencia de una necesidad por parte de la población afectada, fuere actual o proyectada, y que tampoco presentó un porcentaje preciso de la población que tendría acceso a los servicios propuestos.

Además, aduce que del Reglamento 9084 no surge la población flotante como criterio específico a considerar en cuanto a los centros de diálisis, lo cual implica que su consideración estaba limitada a las instalaciones a la cuales el Reglamento aludía expresamente[16]. En apoyo de su teoría, expresó que las personas que reciben servicios de diálisis no lo hacían esporádicamente y, por tanto, no estaban vinculadas a las dinámicas de la población flotante. En virtud de lo anterior, concluyó que el

---

[16] Surge del Art. VIII del Reglamento 9084 que existen instalaciones de salud que requieren que, al momento de la evaluación de su solicitud de un CNC, el Secretario de Salud evalúe y tome en consideración la población flotante a la que se le prestará el servicio.

Secretario de Salud había abusado de su discreción al concluir que la población flotante podía ser tomada en consideración como parte de la propuesta de PLR, pues ello tenía el efecto de inflar los números relacionados a la demanda del servicio.

BMA señala, además, que PLR omitió comparar la oferta de servicios de diálisis con la demanda actual o proyectada. Sostiene que PLR tampoco evidenció la capacidad de tratamiento; por ello, no podía analizar la necesidad para estaciones adicionales ni concluir que existiera una necesidad real en la subregión de Bayamón. Es decir, que no cumplió con el análisis de oferta y demanda, según requerido por el Art. V (2)(f) del Reglamento 9048. Sostiene que el Secretario de Salud debió tomar en consideración el análisis propuesto por BMA en su informe pericial y determinar que no existía necesidad para un nuevo centro de diálisis.

Finalmente, arguye que el Secretario de Salud incidió en cuanto a la metodología utilizada para determinar que existía la necesidad que justificara la concesión del CNC. En particular, señaló que PLR, al calcular la cantidad de pacientes que reciben tratamiento de diálisis, consideró a aquellos que se tratan en el hogar. Sostiene que, contrario a la información acogida por el Secretario de Salud, no se podía concluir que el censo de pacientes (i.e., la totalidad de los pacientes que reciben diálisis) podía incluir en la tasa de utilización (i.e., pacientes que acuden a los centros de diálisis o *in center*) a aquellos pacientes que reciben tratamiento de diálisis en el hogar. Aduce, que lo anterior distorsiona el requisito reglamentario.

Por su parte, en su oposición al recurso, PLR arguye que, tanto el Informe de la Oficial Examinadora como la *Resolución* emitida por el Secretario de Salud en cuanto a la querella presentada por BMA, estaban sustentadas en el expediente administrativo de la propuesta Núm. 21-11-042, toda vez que la prueba presentada rebasaba el criterio de evidencia sustancial. Por tanto, aduce que la determinación del Secretario debe ser sostenida, pues BMA no logró establecer que esta resultase arbitraria o caprichosa. Además, reitera que los señalamientos de error fueron

atendidos durante los procesos administrativos de la propuesta y, tras evaluar la querella de BMA, el Secretario reafirmó su determinación de otorgar el CNC.

En particular, señala que en su propuesta no utilizó a la población flotante como un factor determinante en el análisis poblacional, sino que se consideró como un **factor adicional**, que formaba parte de su propuesta. Aduce que ello quedó demostrado en el informe actualizado[17] y en las contestaciones a la oposición[18] presentadas por PLR en la vista pública del 4 de marzo de 2022.

En cuanto al informe actualizado de su perito, aclaró que, contrario a lo alegado por BMA en su recurso, este contenía un acápite sobre el análisis de la oferta y la demanda, que incluía las proyecciones de crecimiento de pacientes para la población de Puerto Rico y para la subregión de Bayamón. Además, aludió a la relación de la oferta de servicios similares y relevantes entre el sistema de salud operante y la transacción propuesta. Sobre el tema de las contestaciones a la oposición, sugiere que este documento abundaba sobre la prevalencia en la subregión de Bayamón y cómo el crecimiento era cónsono con lo reflejado a través de todo Puerto Rico. Ante ello, arguyó que no se podía concluir que PLR no hubiera presentado evidencia suficiente o deficiente sobre la demanda por servicios de diálisis.

Finalmente, PLR sostiene que, para efectos del cálculo de utilización de los pacientes que reciben tratamiento de diálisis en el hogar, ya el Departamento de Salud había reconocido la necesidad de incluirlos en solicitudes anteriores. Además, subraya que BMA no citó disposición legal alguna que lo prohibiera.

Por su parte, en su oposición al recurso, el Departamento de Salud reitera los mismos planteamientos de PLR. En lo pertinente, sostiene que no debe caber duda sobre la confiabilidad del estudio de necesidad, en

---

[17] *Véase*, apéndice del recurso, a la pág. 522.

[18] *Íd.,* a la pág. 566.

tanto surge del Informe del Oficial Examinador Rodríguez Lugo que ambas partes estuvieron de acuerdo en que el perito de PLR, Fernós Sagebién, había realizado las correcciones pertinentes. Añade que su postura respecto a la población flotante es que, si bien la definición menciona cómo se computará en los casos de instalaciones de salud en las que el área de servicio sea la milla radial, ello no implica que se deba excluir a dicha población de las demás instalaciones de salud.

Además, aclaró que la tasa de utilización debía considerar a los pacientes que se dializan en el hogar, pues estos recibirían servicios multidisciplinarios del centro de salud, y no tomarlos en consideración en el cómputo de la población a ser servida supondría que tales servicios no impactarían el funcionamiento del centro. Inclusive, sostuvo que, aun si se removiera a dicha población para fines el cálculo de la tasa de utilización, ello no derrotaría la correcta determinación del Departamento de Salud. Finalmente, resaltó que la concesión del CNC no se trataba de una aprobación o denegatoria de un permiso, sino de un proceso complejo que culmina con la aprobación del Secretario de Salud quien, cónsono con la jurisprudencia aplicable, tiene amplia discreción para sopesar las circunstancias y múltiples factores técnicos que conlleva el proceso.

Según discutimos previamente, es norma reiterada que las decisiones de los organismos administrativos merecen la mayor deferencia judicial, pues son estos los que cuentan con el conocimiento experto de los asuntos que les son encomendados. Por tanto, el criterio rector que hoy aplicamos es el de la razonabilidad de la actuación de la agencia. Es decir, que nuestra revisión judicial ha de limitarse a determinar si la agencia actuó de manera arbitraria, ilegal, irrazonable, o fuera del marco de los poderes que se le delegaron. Examinadas las posturas de las partes, así como la totalidad del expediente, concluimos que la actuación de la agencia fue correcta y realizada dentro del marco de sus poderes. Veamos.

El argumento medular de la parte recurrente se circunscribe a alegar que el Secretario de Salud erró al considerar la población flotante y

conceder un CNC a PRL. Lo anterior, sin un análisis de oferta y demanda, y al utilizar un cálculo de tasa de utilización incorrecto para determinar que existe una tasa que justifica la concesión del aludido CNC. Por estar intrínsecamente relacionados, discutiremos los referidos señalamientos de error en conjunto.

En primer lugar, si bien es cierto que la población flotante no es un **criterio especifico** a considerar al evaluar la propuesta del CNC, nada surge de la ley o del reglamento que prohíba que este sea considerado como un **factor adicional** en la propuesta. Al revisar el informe actualizado de PLR, así como las contestaciones a la oposición, surge que en ellos se discute la población flotante; sin embargo, ello no se hizo con el fin de exponer un criterio a considerar para establecer la viabilidad de la propuesta, sino con el fin de mostrar el contexto y la localización de la instalación de salud propuesta.

En segundo lugar, surge claramente del expediente que, al presentar el informe actualizado, el cual consideró los señalamientos hechos por BMA, PLR sí incluyó un análisis de oferta y demanda[19]. El mismo contiene las proyecciones de crecimiento para pacientes de Puerto Rico y para la subregión de Bayamón. Además, surge de las contestaciones a la oposición, que PLR abundó sobre el crecimiento de la prevalencia e incidencia en la subregión de Bayamón. Ello fue considerado por el Oficial Examinador Rodríguez Lugo, y así surge del informe que luego fue acogido por el Secretario de Salud[20]. Por tanto, no podemos sino concluir que no se cometió el error señalado por la parte recurrente.

Finalmente, con relación a si el Departamento de Salud podía considerar o no a los pacientes que reciben servicios de diálisis en el hogar, surge del Informe de la Oficial Examinadora Jorge Barranco que PLR presentó evidencia de que, en ocasiones anteriores, el Departamento de

---

[19] *Véase*, apéndice del recurso, a las págs. 539-542.
[20] *Véase*, apéndice del recurso, a la pág. 83.

Salud había reconocido la necesidad de incluir pacientes de modalidad en el hogar[21].

Conforme expusimos, el Reglamento 9084 no impone una fórmula exacta para calcular la oferta y la demanda de la necesidad del servicio, sino que se limita a exigir un análisis financiero, con una descripción de la metodología utilizada, una descripción del área de servicio, que incluya la oferta y la demanda del área a ser servida, y el impacto socioeconómico de la propuesta. De igual forma, no podemos obviar que la Legislatura delegó, y el Tribunal Supremo ha reconocido, la discreción que ostenta el Secretario de Salud para tomar las determinaciones relacionadas al otorgamiento de los CNC. En virtud de ello, concluimos que el Secretario tiene la facultad de considerar factores adicionales, que, como en este caso, se traduce en tomar en cuenta a las personas que reciben servicios de diálisis en el hogar y están adscritas a los centros de tratamiento.

De todo lo anterior se desprende que PLR cumplió a cabalidad con demostrar la existencia de una necesidad real para los servicios de diálisis en la subregión de Bayamón. En ese sentido, concluimos que la determinación administrativa está basada en evidencia sustancial y colegimos que el Departamento de Salud no erró en la aplicación o interpretación de las leyes o los reglamentos aplicables a la controversia de autos. Finalmente, nada surge del expediente que demuestre que el foro administrativo hubiera actuado arbitraria, irrazonable o ilegalmente al realizar sus determinaciones en cuanto a la concesión del CNC.

IV

Por los fundamentos expuestos, **confirmamos** la *Resolución* recurrida.

---

[21] *Íd.*, a la pág. 86.

Notifíquese.

Lo acordó y manda el Tribunal, y lo certifica la secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones